Could you call first and only, Kate? Before you step up here, let me just remind you of a couple of things. One is that the microphone does not amplify, it only records, so please keep your voices up nice and loud. Two is that although we may let you go on longer, you each have 20 minutes, and we may not let you go on longer, so keep that in mind. And I would ask the appellant if you'd like to reserve part of that time for appeal. Yes. I mean for rebuttal. Sorry. We're already in appeal. I would ask to reserve seven minutes. Okay. All right. And when you step up, would you each please tell us your name when you step up. Come on up, counsel. Good afternoon. My name is Nathan Carlsgott, and that's K-A-R-L-S-G-O-D-T. I'm here on behalf of Rennie and Ronald Mendoza. As I've mentioned previously, I'd like to reserve seven minutes for rebuttal. This appeal presents three main questions on review. The first is whether the Memorandum of Understanding is an enforceable contract. The second is whether Rennie's efforts to procure financing from three financial institutions breached the financing contingency of the Memorandum of Understanding. And the third is whether a specific performance, which was ordered by the trial court, was appropriate in this instance. Unfortunately, the answer to all three questions should be answered in the negative. First, with respect to the... But of course, if we answer the first one in the negative, we never get to the other two. That is correct, Your Honor. First, with respect to the enforceability of the Memorandum of Understanding, we've set forth a number of arguments of which I do not intend to recount every single one. However, I would like to point this court to something that was raised on page 18 of the appellee's response brief. And that is that the Memorandum of Understanding concerned both the disillusion of a trust and the conveyance of a real property. And these are two transactions which are ordinarily committed to writing. Now, Plaintiff argues that because the Memorandum of Understanding is in writing, this further supports that it is a binding and enforceable contract. But I would argue the opposite conclusion. The disillusion of trust and the sale of real estate are some of the most ubiquitous transactions in the state of Illinois, amongst other jurisdictions in this country. So much so that the vast majority of similar transactions are conducted by use of form contracts, like the multi-board real estate contract. Now, if you compare the Memorandum of Understanding in this instance to something like the multi-board real estate contract, it looks nothing like a deformed contract. It says nothing of title. It has no common address, no PIN number. You knew what real estate was at issue. There's no question that everybody knew what real estate was at issue, correct, with or without a PIN number? That is correct, Your Honor. The parties knew which real estate was at issue. But the question is whether or not the court should be stepping outside the four corners of the agreement, or what has been determined to be an agreement by the trial court, to consider what exactly property they are talking about conveying. We argue that they should not. Or, at the very least, they should allow us the opportunity to present extrinsic evidence as to the intent of the parties if they are going to do so. But in this case, the Memorandum of Understanding is something quite different than either the dissolution of a trust or a real estate form contract. It uses terms like desire to and agree in principle, which are generally expressions of desires not to be bound in a form of contract. As such, we think that the trial court got that decision wrong. Second. It also uses terms like basically agreement in principle. That's correct. It does use the term agreement in principle, which we consider, and I think those supporting case law, which we've cited in our brief, that that is more akin to an agreement to agree rather than an agreement for a valid and binding and enforceable contract. And typically, agreements to agree are not enforceable. And one of the reasons they're not enforceable is because it is difficult for our courts to fashion a remedy if it is not a binding and enforceable contract. The second issue which I'd like to discuss is… What do you think this was, then? I think this was an agreement of two parties, something slightly more than a handshake, where there was a level of distrust amongst the parties. They did not believe that – the plaintiff did not believe that the trust was being managed properly or that the limited liability was – a company was being managed properly. And so they wanted to bring about some sort of separation between them. Now… And it was your client's idea to prepare the memorandum of understanding, and I believe your client's counsel prepared the document. Is that correct? I don't think that's necessarily correct. Okay. The counsel that prepared the document was technically counsel for the limited liability company, not necessarily Rene and Ronald individually. Now, the parties did negotiate in terms of that. And I – as I mentioned, I think this was something more akin to a gentleman's agreement or a handshake agreement on how they would attempt to proceed if they could. And now, one of the reasons why the question is if they could is because there was a financing contingency provision within the terms of this memorandum of understanding. And with respect to Rene's efforts to procure that financing, I'd ask the Court to take a closer look at the case of Case v. Forloin. And that citation is 266 ill at 3D120. And Case v. Forloin is – comes from a lot of cases that deal with the friction between financing contingency provisions and the duty of good faith and fair dealing inherent in all contracts in Illinois. And in the case – case, the sales contract contained a mortgage contingency clause not entirely unlike the one we find in this particular case. It's not unlike it, correct, to the extent that this didn't just say go try to – go try to get a loan. This said apply for three loans. It was very specific. It was not your usual mortgage contingency clause, correct? It was slightly different in that it did require the application for three loans, although it doesn't set forth what exactly the application of three loans entails. It doesn't require that the application be set forth in writing. And it doesn't require any sort of pointless formality in implying for a loan if the professionals at the bank who have told you in advance they are unwilling to issue financing based upon the structure of your entity. And I realize this was a motion for summary judgment, but your client didn't state the second two loans where he went for, right? Was that in the record somewhere? No. There is no specific reference to what the two other financial institutions were. However, he did testify that he went to two other financial institutions and that he told them the same information that he received from BMO Harris Bank with respect to them being unwilling to issue financing based upon the current structure of the entities. Can you explain that structure? What was that structure? What was the notion of this application? What was it supposed to do? Well, what they wanted to do, I believe, is have the limited liability company take out a loan. So essentially against the assets of the limited liability company. Which at that point were those properties? It would have been the Sheffield. Yeah, it would have been the Sheffield property. Excuse me. No, excuse me. The opposite. The Clark property. The Clark property. I apologize. That would have been the Clark property. Based on the Clark property. That's correct. Let me interrupt you there, though. When you look at the memorandum of understanding, the last paragraph, you got it there, Andy? Yeah, let me pull it out. Okay. What does that mean? Which paragraph are you talking about? The last paragraph. The manager of the LLC will apply for no less than... I take that as meaning that the manager of the LLC is... Using the equity of the Sheffield property. Using the equity of the LLC, essentially, which held ownership of the Sheffield property. No, the LLC had the Clark property. Excuse me. I apologize. I've done that twice now and I apologize. Thank you for... And the Sheffield property was going to... So is this saying that the property she was getting was going to be collateral for the loan that she was getting the proceeds out of? I think the opposite. I think they... That's why I'm asking you to explain it to me, if you know. The Sheffield property here, I don't understand. I think she was going to get the Sheffield property and a sum of money to be financed by Renee and Ronald borrowing against the LLC. And when I say Renee and Ronald, I mean the LLC borrowing against the assets of the LLC. But using the equity of the Sheffield property for the credit decision. I'm just having trouble understanding. I don't know if I have an answer as to that point. That's fair enough. If this isn't binding, why did your client try to comply with it by going to the three letters? Well, I think if you have a handshake agreement or a memorandum of understanding in any situation, the point is that you want to achieve a result down the line that will bring about some sort of resolution of whatever goal it is that you have. In this particular instance, it seems to be the separation of their interests. Now, regardless of whether it was the facts in this case or in some other commercial transaction where you have a memorandum of understanding, persons are going to take certain acts in furtherance to see if they cannot accomplish that which they seem to have an aligned interest in doing. So in this instance, they want to separate the assets. They're willing to see if they can get and obtain some sort of financing that will allow them to do that. And what they have to do is they have to go out and see if it's even a possibility. Now, I hate to do this because I know it's not in the record, but since it's in the record, why was this so hard? Everybody wanted to split up. Why in the world have you been litigating for years over a split up that everybody wants? I think the problem is that they are unable to obtain financing individually for this. And based upon the way it's set up in the LLC, they cannot obtain financing as it currently exists. So they don't have the money to buy her out. Exactly. That I apologize for being so abstract about it. They want to buy her out. They want to buy her out. But they don't have the money to buy her out. It says that due to the ownership structure for the properties, the lenders wouldn't consider giving him a commercial loan. This is a property that's worth $2.6 million. Were there loans against it already? I don't know the answer to that off the top of my head. And there were tenants. And to get a less than 10% loan? You mean that as collateral? I'm just, I don't get it. I believe in the record, you'll find that Rennie did dispute whether or not the property was actually worth what they were saying that it was worth.  In principle. In principle. In principle. Asked for that amount. Although I think he did, during his deposition, in affidavits, dispute whether or not it was actually worth what they were saying it was worth, which might have been one of the reasons why the bank was unwilling to issue financing for this particular transaction. Are there other mortgages or encumbrances on the property? I apologize. I think Judge Griffin has the same question. And I don't know that I have the answer to that question. And I don't know if you'll find it in the record. Nevertheless, in this instance, I do believe that Rennie has, if I go back to the case for a spoilering case, that his efforts to procure financing are similar to that case. There, following the plaintiff's acceptance of the contract, the plaintiff, or the defendant, proceeded to contact various financial institutions regarding financing. And although the defendant contacted a number of financial institutions, he admitted at trial, a bench trial in that case, that he did not submit a formal written application within the 30-day window as called for in the contract. He testified, though, however, that he considered that a final step. And if you compare that to here, where Rennie similarly did not submit a written application because it was a pointless formality, as the financial institutions had already told him they would not issue him financing based upon the current structure, I think the situations are comparable. And so after the bench trial in case, the trial court determined that the plaintiff had not proven her case in demonstrating that the defendant, simply by virtue of not submitting that written application, had breached the duty of good faith and fair dealing in exercising that financing contingency. And on appeal, in front of the first district, the first district analyzed that whether a party has, to a contract, has acted reasonably and in good faith are questions of fact. But that's an in good faith and fair dealing clause that we're dealing with. That's not the clause we're dealing with here. We're dealing with a very different clause. I really question whether that case helps you. Because good faith and fair dealing, generally a question of fact, this is apply for three loans, not good faith and fair dealing. She's not saying you didn't act in good faith and fair dealing. She's saying you didn't apply for three loans, and you, your clients are in control of whatever evidence there is that you applied, and you can't even name the banks. So I don't think you came forward, with all due respect, as you guys like to say to us, with much evidence that you applied for three loans. Whether that means filling out paper or going to talk to a bank officer or whatever it means, what evidence did you put forward that you applied in any definition for three loans? Yes. I guess that's my point. Yes. And I think there's, I guess I think there may be bigger problems with this contract than that. I mean, you know, I guess, I just don't think that case is on all fours for you. Okay. Can you finish your thought, though? Yeah, sure. The fact that. . . You said that case found that it was a fact question. Yeah, but it was a fact question, and whether or not Renning's efforts in this case were sufficient under the financing contingency is also a fact question. What is the analysis of the case that you were speaking of? You had a thought going with the analysis. In just this week. How do you want. . . No, no. Just this morning. . . . . . So what I was saying about the case, case, policy. . . I apologize. Case E-4, that is, is that in conducting its analysis, the first district upheld the decision of the trial court in finding that the defendant, that the plaintiff had not proved their case, that the defendant acted in violation of good faith and fair dealing. And they said that whether a party to a contract has acted reasonably in good faith are questions of fact exclusively within the province of the trier of fact to be determined by assessing the individual circumstances surrounding the party's actions. So the thought is this, is Renning went to. . . He's testified that he went to BMO Harris Bank, and he's testified that he's gone to two other financial institutions. He's also testified that when he went there, they told him they would not issue him a loan after giving certain information based upon the current structure of the entities. He did. . . He didn't submit a written application, but I would suggest that the memorandum of understanding does not require him to submit an application. It does say he needs to apply, but if the financing institution tells him that there is no chance that they will give him financing, then what is the point of requiring him to fill out an application and ask them to go through that work? Did he communicate that at some point to anyone in writing? In writing. What did he communicate? Yes, I think he testified to that. He testified that he did communicate that to Roslyn. Yes, he said that Roslyn was aware of the fact that he was unable to obtain financing. And I guess my next question is, was that communicated to Roslyn in writing? I don't think that there is a writing reflecting that in the record. Just out of curiosity, it says he will apply for no less than three loans. Are there like $66,000 each, or is there . . . I don't get . . . I understand. And I think that's part of the problem is that this one-page memorandum of understanding, which we are attempting to use to both dissolve a trust and convey real estate, are not sufficiently detailed in order for one to conclude that it was a binding and enforceable contract. As we've mentioned in our opening brief, it's a Skyler Memorandum of Understanding, and every paragraph is set forth as a recital. The language of the agreement says desire to, an agreement in principle. There are many factors which indicate that it is not intended to be an end-of-the-line written agreement between the parties. No, I get that. But do you have any idea, was there like an anticipation? That there would be a problem getting a loan, that's why you have to apply for three of them? I just don't . . . I've never heard that concept. You have to apply for three loans. I think it's certainly conceivable that one might have anticipated that they would have a difficult time obtaining financing based upon their existing structure. And lastly, I would point out that if the court does reverse in this matter, the plaintiff here is not without recourse or remedy. She has two additional counts in this claim, a count asking for Rennie to be removed as trustee, and a count asking for dissolution of the LLC. So if it were sent back down, it is not as though she would have no opportunity to effectuate some sort of dissolution as she seems to be doing vis-à-vis the memorandum of understanding. And I will . . . Reserve the rest of your time. Any more questions? No. Thank you. Thank you. Counsel. Good afternoon, Your Honors, and may it please the Court. My name is Jason Jockum, J-O-C-H-U-M. And along with Mr. Edward Clinton, Jr., we represent the plaintiff and appellee Rosalyn Mendoza. On behalf of herself, on behalf of the Richard H. Mendoza Trust, and on behalf of Mendoza Family Holdings LLC. Your Honors, you asked several questions, obviously, to opposing counsel, and I believe I have some answers to some of those. But simply put . . . Let's just start with the Trust and the LLC are parties to this, correct? Mr. Mendoza was sued on behalf of himself and also as manager of the LLC and as trustee of the Richard H. Mendoza Trust. But the memorandum of understanding that we're trying to specifically perform, they're not a party to that memorandum. No, Your Honor, they're not. So the simple fact here is the parties . . . I have a quick preliminary question. Sure. Is this a final judgment or is this a 304A appeal, or do you know? This is a final judgment. That's what I thought. So I'm confused by his reference to other counts. There's just another claim pending between the parties? The trial court, upon kind of resolving this matter, found for summary judgment for Ms. Mendoza Rosalyn on count two.  And therefore, removal of Mr. Mendoza as trustee of the Trust would be moot because the case itself had been dissolved. I see. So the remaining claims were either resolved as moot or voluntarily dismissed. That would become revolved if we were to reverse. Of course, Your Honor. I see. Okay. The parties here, they had a deal. I mean, counsel, we've noted in our brief, these parties, they've known each other all their lives. These are siblings to a trust. Dad died, put the siblings all together in a trust, put Mr. Mendoza in charge of the trust as the trustee. So these parties have known each other all their lives, and they don't particularly enjoy being around one another. Now, Your Honor's asked, well, why don't they just split? And we actually asked that question of Mr. Mendoza during his deposition. Actually, it was after his deposition. And the reason why they haven't split is he's taken a reasonable position regarding having them move forward. His idea is that their parents wanted all of them to live together in the Sheffield property, which has three levels. So there's an upper level, a mid-flat, and then a basement that's kind of combined with the second. Is this in the record? No, unfortunately, it isn't. But you asked the question, so I was there. I said it's always a problem question. Let me ask you a different problem question. Sure. What does it mean in the MOU, using the equity, and I'm talking to the same part that Justice Griffin asked about, that these two loans must be in the name of the LLC using the equity of the Sheffield property for the credit decision? What does that mean? Well, unfortunately, we know what it says, which it says using the equity of that property to get the loan. It's supposed to go to your client. It's supposed to go to my client to get the loan. Now, again, the agreement was drafted by Mr. Hodgeau, who was retained by Mr. Mendoza, the defendant in this case. He drafted it, and the parties executed and signed it. My client had counsel present at that time as well, and she executed it. Unfortunately, not that Your Honor's question doesn't matter, but it's kind of undisputed that Mr. Mendoza didn't do that. He didn't fill out any loan application using any equity in any property as collateral. But you're not answering the question. Are you getting there? Partially. What does it mean? It means he's supposed to use the equity in the property as collateral for the loan. All of these properties are unencumbered. There are no other loans or mortgages against these properties. So the full value is what's been laid out in the record is their actual value itself. It says what it says. Again, the Sheffield property was to go to Rosslyn, correct? Yes. But the LLC was to obtain a loan using the Sheffield property as collateral. Well, I don't believe it even says the LLC. It just says that. Okay. Well, it says it in the name of the LLC. Yeah, I thought it did, too. But if you say it doesn't, I don't want to. It's supposed to be in the name of the LLC using the equity of the Sheffield property for the credit decision. And if Your Honor, let's look at all the terms in this agreement. They are extremely favorable. I mean, this is a 15-year mortgage, no interest. Let's come back to the question. The question is, and again, it's the same question that the other justices are asking. Sure. What sense did that make? Your Honor, you agree it makes no sense, correct? I agree that it's an unusual term that the parties put into the agreement, and they executed that agreement with the benefit of counsel. So you agree that it makes no sense. How is the court supposed to make sense out of it to grant specific performance? I'm really struggling, actually. Your Honor, we don't admit that that clause makes no sense. What we would admit is that my client, Ms. Mendoza, wanted to be rid and kind of split her dealings away from her brother. If you look at the rest of it. How does she, because her brother would continue to control, and I believe the brother is Rene, correct? Yes. Rene would continue to control the LLC along with the other brother, and the trust would be dissolved. Yes. And the LLC would have the property, the Sheffield property would be owned by Roslyn, but the LLC would still have a loan outstanding using the Sheffield property as collateral. Which the LLC would be responsible for the payment of that loan. So she doesn't get rid of her brothers. This agreement doesn't allow her to get rid of her brothers. For the most part, it does, Your Honor. Explain it. The LLC would be responsible for the payments on that particular loan, but as far as dealing with her brother, if he violated the mortgage or the agreement on that particular loan that he would obtain, then obviously that may cause a concern. But again, yes. So she's not free of her brothers. But even, she'd get a property that's worth $650,000 that has a $200,000 lien on it, so it's only worth $450,000. So the $200,000 she gets, it just doesn't make sense. Your Honor, I agree that the clause itself is, it doesn't, it may not be the most properly drafted. It probably, they might have meant the Clark property, but Your Honors, we have the agreement, it says what it says. I mean, as far as the writing itself, it is unambiguous as far as what it says. It says that he's supposed to fill out the three applications using that parcel of land as collateral. And it's undisputed that he did not fill out any applications. When we look to a contract and we're trying to determine if it is a contract, there's three general factors, and we've laid those out. First is, and as counsel addressed this, was this a type of agreement the parties would have put into writing? And it is. It's a contract with the sale of land. It's a contract to dissolve the trust. Again, knowing that these parties have dealt with each other. It doesn't have a lot of terms. It does missing a lot of terms. I mean, the legal description, I'll grant you, that would normally be in a contract like this. But the address in the pen would be. Your Honor, I would agree with you that if it was a more formalized agreement, yes. However, first, the defendants did not raise that issue until the motion to reconsider. So they did waive that issue at trial. Secondly, the properties themselves. I mean, everybody knew what these properties were that were signing at the table. Everybody knew that this was. These properties had been in the trust for many, many years. So nobody used parole evidence to flesh this out, right? Which is. Within the four courts. Well, in Timberline, the court stated that a party could use extrinsic evidence to identify the property. And in this case, again, using extrinsic evidence as stated in Timberline. The parties could identify the properties. The purchase prices for all the properties are listed. The payment terms are listed. Although they may not be exactly, you know, what, you know, understandable to this court today. But the payment terms are listed as far as what they will be. It contains all the proper and necessary terms for. But what about it's a real estate deal? Yes, Your Honor. What about title insurance? What about clear title? What if there are liens against it? I have no idea what they might be. You're saying there's no mortgages. That's good. What about judgment liens? What about mechanics liens? What about taxes? Well, how are they handling the taxes? Was that going to be 100%? Are there other issues? Were there proper statutory disclosures required? I mean, it's pretty sparse not to mention the disillusion, dissolving the trust, the title of the property. Who does that go to then if they dissolve the trust? Well, for instance, Your Honor, you mentioned missing terms. And we cited to Schilling v. Stahl in our brief. And in Schilling, there were actually 13 missing items that were not contained in the agreement. But the appellate court said these would have been taken flushed out in a subsequent agreement. And again, the Gianna's case states just because a more formalized agreement may have been contemplated by the parties in the future does not mean that this agreement itself is not binding and enforceable. It contains all the necessary and proper terms that basically mean from here we know what we're doing. There's really not much left to do except kind of flush out the exact terms Your Honor mentioned, you know, taxes, title, insurance, something like that, which would be more formulaic in a closing document. Well, but, you know, there is that case that I think they cite where the court would be left to order further negotiations where the parties have yet to reach agreement on essential terms, specific performance is not available. And Schilling, weren't those all dealing with the mortgage? There's 13 items. I think we're all dealing with the mortgage. Well, for instance, if procedures and costs and fees in case of foreclosure, grace period before default, maintenance of insurance, remedy for failure to pay taxes, all of those were not included in the Schilling contract that the second district upheld. But how about the Schilling contract that said notice the parties. By the signing of this contract, you're entering into a binding legal agreement. And then it goes on in bold type. I mean, isn't that kind of quick money? You want to notice? Well, it could be, Your Honor. But in this case, the agreement does not say that it is a non-binding agreement. And we have the court decision. And again, it is undisputed that Mr. Herschel drafted the agreement. If Rene wanted the agreement not to be binding, his attorney simply had needed to insert one clause, this is not a binding agreement upon the parties. That line is nowhere in the memorandum of understanding. One sentence would have taken care of, I don't want this to be binding. Or it could have said it would be binding.  Yes, Your Honor. And I think you're also referring to the case versus foregoing case that was cited by my opposing counsel here. And, again, the case case was not cited in the trial court. It was cited originally on appeal. And, again, we believe that that issue has been waived. The one I cited was Sinman versus Reliance Federal. That's the one I quoted from. Anyway, you don't waive your right to cite cases. You might waive arguments, but you don't waive your right to cite cases. Of course. But that argument regarding the covenant of fair dealing was never raised in the trial court. It was raised originally on appeal here. I mean, in the preamble it says that the parties are members of the Mendoza family holdings. But that's not true. Isn't the trust owned 95 percent of the LLC? You're exactly right, Your Honor. The trust actually owns about approximately 95 and change. And then the parties, so Renee Mendoza, Ronald Mendoza, and Rosalind Mendoza, each own a small percentage of the remaining balance. So, technically, they are all parties, members of the LLC themselves. But the trust holds the, by far, the lion's share of the LLC membership. And I believe that was originally set up for tax purposes. Now, Your Honor has also asked certain questions regarding the liens and the properties. We talked about that, that there are no liens or encumbrances on this property. For Mr. Mendoza to say that he could not get a loan or some type of equity or money based on the equity in these properties, based for either the LLC or the trust, is preposterous. It wasn't based on that. He said it was based upon the structure of the ownership of the property. Well, and, again, that's also based on his testimony when he was deposed, where he originally said, I talked to somebody that said it would be a waste of time. He couldn't name the other two banks. We sent out a subpoena to BMO Harris, which is the only bank he was able to identify at all. And they returned no documents responsive to any loan applications submitted by Mr. Mendoza at all. But a lot of this will get to credibility, and this is a motion for summary judgment. Even his own attorney, Your Honor, at oral argument stated, characterized Mr. Mendoza's attempts as he attempted to apply. His own affidavit served as responsive to the original response to the motion for partial summary judgment stated, I went and visited three branches. He said nothing about actually submitting an application. We use words like apply in agreements all the time. And the word has kind of a general and fixed meaning. It doesn't mean you go to the bank and I talk to somebody and they say no. It means they're on an application. The language is so loose here, it just says he will apply. But as a matter of fact, the seller is financing. It says it will finance the remaining $333,000 over a term of years between 15 years. Yes. What does between 15 years mean? Up to 15 years. I mean, between 15 and what? Your Honor, it says up to 15 years. It doesn't. It says between 15 years. So it doesn't say file an application. It says applies. I mean, I don't, this is, I don't know what. And, again, that is in a different section, and that means that this Mendoza, Rosalind, is going to give her brother basically an interest-free mortgage between 15 years. Over a term of years between 15 years. And, again, we also get back to who drafted this agreement. It was not drafted by Rosalind. It was drafted by Mr. Mendoza. Mendoza. I forget the Latin term you guys used here, but that it's interpreted against the draft or whatever that is. Yes. It's a pretty good term, by the way. But you only get into that if it's ambiguous. And we're trying to specifically perform a contract here. And if it's ambiguous, does specific performance apply? Your Honor, first of all, we have to get to, for specific performance to apply, and the rule has been set forth, the terms must be sufficiently definite to actually allow for performance. And the trial court's decision recognizes. It said it granted summary judgment as to the property. So the Sheffield property should be deeded over to Rosalind. It granted her a judgment regarding the closing, the $200,000 that would have been the downstroke she would have received on the property. However, it gave no remedy regarding the additional mortgage that was outstanding on that issue. So the trial court recognized that these were sufficiently definite terms and they should be applied as they are written. Shouldn't it have been a term that she had to transfer her interest to the LLC as well? I would believe that that would be kind of an assumption of disagreement, Your Honor. In terms of the specific performance, I think it's in the agreement, but I don't think it's in the order of specific performance. If it isn't, Your Honor, then that was an oversight on our part and obvious. And our claim is readily willing to transfer her ownership of the LLC or membership of the LLC back to Mr. And I'm reading the court's order. It does include that they're going to execute a note in the principal amount of $333,000 with 0.01% interest payable over 15 years. That is part of the court's order. But I don't think it says anything about her transferring her LLC. Then obviously, that should be part of the order, Your Honor. There's no doubt about that. And Rosalind understands that. And she wants to be separated from her siblings. I mean, especially, in this case, Mr. Mendoza. But the order also says, number one, the Richard H. Mendoza Living Trust shall be terminated. Well, what happens then? Well, the trust itself would owns the – essentially by breaking up the properties and giving Rosalind the shelter property, the trust itself is essentially mooted at this point. It doesn't really exist. I mean, it does on paper, but it doesn't actually own the – But wouldn't your client need to, before it's terminated, transfer her interest or something? I mean, if you just terminate it, where are we? We have three beneficiaries. Do they even get anything? It doesn't – title of the property, if you go to the recorder's office, it says it's owned by this trust. If it's been terminated, who holds title to the property? Well, I think it should be – the property on Sheffield should be obviously titled in Rosalind's name, as the MOUs called for. And the Clark property should be titled in Richard and Ronald's name or in the LLC's name, when Rosalind signs over her interest in the LLC, as she will. So, again, the fundamental – what the parties were intending to do was, Rosalind gets Sheffield, which was a two-flat, and her brothers get the income-producing property with the rental units on Clark. This – by settling these properties – Two-flat or three-flat? These are the three apartments. It's actually – Sheffield only has two apartments that are legal. It has a basement – It only has three apartments. It has three levels, but there are only two apartments that can actually be legally rented. And then the – what does this really mean, the last – the fifth circle? What does that mean, when they say that at least two of the loans must be in the name of the LLC? It sounds like the agreement may have contemplated that Rene would apply for a loan in his own name and then two loans in the name of the LLC, or maybe even two in his own name and at least two in the LLC, and there would be several different loans on the property. Is that what that means? I believe, Your Honor, is hitting it on the first one, that he would have applied for loans at different institutions, probably for the entire amount. It's – just based on – It's unclear, he would say. It's – I would say that it's unclear that – If it's unclear, how does the court enforce it? Well, Your Honor, I mean, whether or not he applied for one loan for $66,666 at three different institutions or – That would be possible, because if he applied for one loan in his own name, and even if he received that loan, he would not have done enough. And I'm not sure, because I don't know what that means, but one thing it could mean is that he was required to have at least two of the loans be in the name of the LLC. What reason for that, we don't know, but that's a requirement here, and it just makes no sense. I can understand your point, Your Honor, that applying for the loans in the name of the LLC, but, again, looking at what would have happened after this agreement would be that Rosalynn would not be part of the LLC, and it would solely be Mr. Mendoza's – the brothers would be the LLC from this point moving forward, but they would now have that burden of the loan on them to partially buy Rosalynn out from the difference in value between the properties. Now, as far as your original question, does it say – Could he have applied for – gotten approved for financing at three different financial institutions and taken three different loans out? He could have done whatever he wanted to do. He could have definitely gotten loans for one-third of that amount of interest. Well, I'm not sure he could do whatever he wanted to do because he did what he wanted to do. Well – So I'm not sure. If that's what you're saying, then there's just no agreement whatsoever. He could have done whatever – My understanding means nothing if you're correcting your last statement. No, Your Honor. He could have done whatever he wanted to do within compliance within the agreement itself. But the evidence in his own testimony and his own affidavit demonstrate that he didn't do anything. He allegedly talked to three people. However, he's countermeasured that. You know, he said, I talked to one person, then it was three people. His attorney states he attempted to apply. The facts are there was overwhelming evidence that he didn't – He made a phone call to the bank. He started the application process. Sure. And you tell the bank that the property is owned by a trust. And then Harris, being a premier bank, probably says, we don't do those kind of loans. Okay. Well, then – Nope, we don't do those kind of loans. It doesn't say – It sends you over to this department. It goes to that department. It says, nope, we don't do those kind of loans. So would that constitute three applications? No, Your Honor. It says apply. And we use terms like apply every day in agreements. And it doesn't mean – when you say must apply for a loan, to have that mean I go into a bank, I talk to somebody, and they allegedly told me that I couldn't get the loan, that is not an application. That's how you use the word allegedly. But it is – applying for a loan isn't defined in there. It is not defined in there. But given the ordinary and customary meaning, if we were to use the word apply to mean I talked to somebody at the bank, and they probably told me I couldn't get a loan, then we can throw out a lot of – Didn't they subsequently give you a denial letter? If this were a seller or a buyer attempting to buy someone's property, and he called the bank, the bank says, you know what? You just don't make enough money. You could never do this loan. Give you a denial letter. You submit the denial letter. You get your earnest money back. Sure. If there was contingency, you comply. And, Your Honor, I would agree. If he had submitted three denial letters, saying I have three denial letters from a financial institution saying I could not get a loan from them, that would suffice. That would be apply. That's required by this agreement, you believe? No. Unless you point it out to me, that's all. Well, Your Honor, you raise the hypothetical. I'm saying if he had those, he would have complied. He didn't. He doesn't have any denial letters. He has nothing. Isn't there some equitable principle about not requiring useless acts or something like that? And if – so if they tell you – You took the thought right out of my mind. I'm sorry? Thanks. So if you're applying and they say we're not considering it, do you have to still file an application? No, Your Honor, that's when we get back into the covenant of good faith, fair dealing, and those equitable principles. The contract doesn't contain those. It says apply. The contract is interpreted as it's written. It says apply. Let me just ask you, I think, is there a showing in the record on summary judgment that this was useless? Was there any showing by the defendants that this was useless, that they couldn't get these loans? Was that showing made on summary judgment? There was no statement made by the defendant at all. In fact, it was – the only statement he made was I talked to somebody, they said I couldn't get it. There was no – Without naming the bank, without saying who did it, without saying where. Exactly. There was no testimony on it. They did not bring in any affidavit from any bank saying that they had actually talked to him or any bank personnel saying they had talked to him. But that doesn't go to his credibility. But, Your Honor, there was nothing. He has no – I agree with you. But, I mean, didn't he testify to that, that he went to three places, talked to somebody, and they turned him down? He went to – You're saying that that's unbelievable. I believe that he didn't say that they turned him down. He said it would be a waste of time. And it was – he convened one place, and then after promulgating, he convened two. I mean, we laid it out in our statement of the facts, the whole – the deposition, and then when he was originally questioned in this deposition, he said he didn't apply. And then when he was asked by his own counsel, he did. So his affidavit in response to summary of judgment says I walked in three places. It doesn't say I applied. It doesn't say I filled out anything. So, I mean, we're turning the word apply, I think. We're torturing the meaning to try and, you know, get to a defendant's argument here. Let me ask you a question, though. What is your understanding of what would have happened if the defendants had complied with seeking the loan and hadn't been able to get it? It's my client's understanding that it was almost assuredly that he would have gotten the loan. His own attorney had stated to him that this was why it was drafted in that manner. That this would help him get the loan. That this would help him get the loan. That there was plenty of equity, that there should be no problem. Then why did they say apply three times? And what's the answer, though, to Judge Mappa's question? What if he didn't get it? Your Honor, as far as the apply three times, two questions. I'll try to answer them in kind. Why apply three times? I think there was a level of mistrust based upon these parties and their past dealings with each other that, you know, my client wanted to make sure he would actually do it. You know, not just go to one bank, but actually go to three different financial institutions. Not just go to the guy on the corner, but actually go to reputable financial institutions and attempt to get a loan, which he didn't do. He didn't actually do that. And then, Your Honor, what was your second question? I apologize. What would have happened here? That was my initial question. If he had complied, I would agree that this could be... But if they got over the $200,000, what happens? It's contingent. It is a contingent clause. So if the agreement says, and it does, that he has to apply for three different loans and... It says he's going to pay $200,000 at closing contingent on getting a loan. Exactly. So if he has to work on a loan, then the agreement doesn't go through. But in this case, he never... The whole agreement falls apart? I would say so. Or just that part of the agreement? I would say that the entire agreement, because then there would not be ability to split up the assets one-third, one-third, one-third. But the evidence is clear that he did not attempt to do that. So we're trying to specifically enforce the agreement. We're trying to kind of, I think, figure out what it's trying to say here. What does this part mean? Buyer will purchase seller's 33 and a third post-trust disillusioned interest in the LLC. Well, the agreement is... It contemplates the trust would be dissolved. So at that point, what was remaining of the trust would be divided one-third, one-third, one-third. So the buyer in this case, that would be the brothers, would purchase Ms. Rosalyn Mendoza's interest for that amount. So essentially, that's saying this is the total amount she's going to get. She's going to get the $1.18 million, which is 33.3% of the trust assets at that time. Just so I'm sure that I understand your answer, I think, to Justice Griffin, once the trust is resolved, each of the siblings owns a third of the LLC. Owns a third of the LLC and the remaining trust assets. But the trust is dissolved. Trust would be dissolved. So once the trust is resolved, they each own a third of the LLC. Yes. Up until the time the trust is resolved, the trust actually owns 95%. 95%. And she owns only, like, 3% or 2%. I think it's like 1.2. We cited to it in the statement of facts. But it's a minimal amount that she actually owns personally. So of that $1.18, she gets the $650. That was the value they placed on the Sheffield property, the $200,000 for the downstroke, and then the $333,000 mortgage over a period of years. And from where did these values come? The parties actually had the properties appraised prior to the memorandum of understanding. So each property was professionally appraised. Anything else? Anything else? No, thanks. For the reasons stated therein, we respectfully request that the Court affirm the trial court's ruling. Thank you, Your Honors. Briefly, Your Honors, I think what you've heard from both counsels today is that it's difficult to answer some of the very pointed questions that you're asking. The problem is that, at least the problem for the plaintiff, is that the reason why we can't answer them is because the agreement itself is ambiguous. And that's the position that we've maintained from the get-go in this case. And in order to resolve the ambiguity, this Court would have to consider extrinsic evidence in order to help determine whether or not it was intended to be a binding contract, whether or not it was intended, what the terms were, what the terms mean that are set forth. And absent an evidentiary hearing where that extrinsic evidence is produced, where the credibility of the witnesses is weighed, I don't think the trial court could reach the conclusion that it did. You'd have to look past some pretty confusing language in the memorandum of understanding in order to reach the result of specific performance. Justice Griffin pointed out that there is an inherent conflict between specific performance and ambiguity. You're only supposed to rule specific performance if you're free from doubt as to what the terms of the agreement are. So your view, if we were to reverse, is that the case would go back for an evidentiary hearing as to when the contract is enforceable? I think the Court should rule that it's not enforceable because it's obviously a memorandum of understanding. There were cross-motions for some reason. There were no cross-motions.  No. But at the very least, the agreement would be ambiguous and require consideration by a prior fact as to what exactly it was that these parties intended. So your client's position is that there are material issues of fact? Of course. That is our position. Our position is that there are material issues of fact with respect to both summary judgment awards, both the determination that it was a binding and enforceable agreement, and as to whether or not Randy Mendoza's efforts to procure financing breached the financing contingency provision of the memorandum of understanding. Now, I would have loved to have found a case for you that specifically addressed that inherent conflict between ambiguity and specific performance. I couldn't find that one. But I recognize the proposition because I tried myself to find it, Your Honor. But you do agree that if it goes back, all accounts are back in play? Yes. Second, you know, I think what we heard is that from both counsels, to be frank, is that we're here in some respects negotiating the terms of the memorandum of understanding, at least the holes in the terms that you are pointing out, based upon what we think are the positions of the parties. And if we're doing that, we're demonstrating that there are genuine issues of material fact, and that the case should go back down. And lastly, in determining whether or not Randy's efforts to procure financing met the requirements of the word apply in the memorandum of understanding, I think that the trial court had to weigh his credibility in reaching that conclusion. To dismiss his efforts to do so was to conclude that he was not a credible witness, that his efforts, that his testimony, that he did not, that he went to these financial institutions and he was told that he was not going to get financing based upon the structure of the company was not believable. And the trial court was doing that. It was improper on the motion for summary judgment, on both motions for summary judgment. And thus, I would ask that the trial court's orders be reversed and the case be remanded. Thank you. Can you guys give us one minute? Sure. Thank you. Thank you. I just didn't want to say this without talking to my colleagues, but this is a case that started out as an attempt to settle something that clearly has to be settled. You've now been litigating, and I think both the parties are here. I see that your client is here. I think your client is here, so I'm speaking to you as well. I'm trying not to put on my trial court hat, but to say that, you know, you've spent a lot of money on legal fees. You've got really good lawyers involved in this case now, and I'm sure it's costing you a fair amount of money. If that lawyer retell could be used to see if you can't work out a settlement that you can actually all live with instead of litigating whether or not you have a settlement, and I'm sure you had a very good trial court judge. I'm sure she told you a lot of this, but everybody's unhappy with the settlement. That's what a settlement is. But we would like to give you some time before we issue an opinion in this case to try to settle it. So what I'd like to tell you is that we'll give you 14 days if you're making progress before then to send a letter to the court, to the clerk of the court, who will get it to us, saying we're making progress. We'd like another 14 days, whatever you ask for. If you think after talking it's not going to settle, that's fine. Decide in case this is what we do, and we're happy to decide it. So spend the next 14 days figuring out whether continuing to talk makes sense or getting an opinion from us makes sense. All right? So we will take it under advisement. We will hear from you before we hear you hear from us. Okay? Thank you all.